IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PEGASUS DEVELOPMENT             :      CIVIL ACTION
CORPORATION, Plaintiff and      :
Counter-defendant               :
                                :
     v.                         :
                                :
JOHN HANE, Defendant and        :
Counter-plaintiff               :
                                :
     v.                         :
                                :
MARSHALL W. PAGON,              :
Counter-defendant               :      NO. 05-6148

MEMORANDUM AND ORDER

McLaughlin, J.                          September 27, 2007

        Pegasus Development Corp. ("PDC") began this litigation
by filing a complaint against John Hane ("Hane"), seeking a
declaration that it has no further obligations to Hane under a
securities purchase agreement that the parties executed in late
1999.  Hane has responded by alleging two counterclaims against
PDC and a cross-claim against Marshall Pagon ("Pagon"), PDC's
CEO.  The parties have now filed cross motions for summary
judgment on all claims.  The Court will grant PDC's motion and
deny Hane's motion.

I.    The Summary Judgment Record

        Hane is the founder and CEO of Highcast Network, Inc.
("Highcast"), a corporation that was created to pursue a
technology that would enable satellite television providers to
insert local advertising announcements into network programming.
In 1998, PDC became interested in Highcast's advertising
technology and began negotiating a deal to purchase Highcast's
intellectual property, as well as to hire Hane.  These
negotiations resulted in (i) PDC employing Hane as a Senior Vice
President, and (ii) PDC agreeing to purchase equity in Highcast.
Hane's employment with PDC was governed by the terms of an
employment agreement dated July 23, 1999, and PDC's purchase of
equity in Highcast was governed by the Securities Purchase
Agreement ("SPA"), dated December 15, 1999.

        Under the SPA, PDC agreed to purchase shares of
Highcast at a series of closings that would take place according
to the following terms.  At the "First Closing," PDC agreed to
purchase 111 shares of Highcast common stock ("First Closing
Shares") for $93,750.  This purchase represented approximately
10% of Highcast's equity and was scheduled to take place on
December 15, 1999.  Under the heading, "Conditions to Purchaser's
Obligations at the First Closing," the SPA recited various events
that needed to take place before PDC became obligated to purchase
the First Closing Shares.  These conditions included (i) the

-2-

reduction of Highcast's board of directors to two individuals --
Hane and Pagon, and (ii) the amendment of certain Highcast bylaws
to reflect the change in board membership.

At seven "Additional First Closings," PDC agreed to
purchase up to 70% more of Highcast's equity in 10% tranches.
The Additional First Closings were scheduled to take place within
30 days of Highcast's satisfaction of milestones set forth in a
document called the First Budget.  At the time the SPA was
executed, the First Budget had not yet been agreed upon.  Rather,
under the subsection entitled "First Budget," the SPA specified
that Hane and PDC "shall cooperate in the preparation of a
business plan and budget of [Highcast] mutually acceptable [sic]
the parties hereto regarding the use of up to $750,000 to be
invested by [PDC] pursuant to this Agreement as soon as
reasonably practicable, but no later than February 29, 2000 and
January 31, 2000, respectively."

Under the heading, "Conditions to Purchaser's
Obligations at Each Additional First Closing," the SPA recited
various events that needed to take place before PDC became
obligated to purchase each successive block of shares at the
Additional First Closings.  These events included (i) agreement
between Highcast and PDC on a First Budget, and (ii) continuation
of Hane's employment at PDC, so long as PDC owned less than 50%
of Highcast's equity.

-3-

The First Closing, as it was originally contemplated, never took place.  Instead, the SPA was amended on February 7, 2000, at which time the parties agreed to split the First Closing into an "Initial First Closing" and a "Final First Closing."  At the Initial First Closing, which was to take place on the day the SPA was amended, 53 shares of Highcast common stock would be conveyed to PDC in exchange for $46,875.  At the Final First Closing, which was to take place on a date mutually agreeable to the parties, 58 shares of Highcast common stock would be conveyed to PDC in exchange for $46,875.  All other terms of the SPA remained in full force and effect.

The Initial First Closing occurred on February 7, 2000.  At that time, Highcast's board of directors was reduced to Hane and Pagon, and Highcast's bylaws were amended, as specified by the SPA.  No other closings ever took place.  Despite the non-occurrence of further closings, Hane continued working at PDC.

Over the course of Hane's employment at PDC, Hane spent the majority of his time working on PDC projects.  Hane did, however, continue to pursue patent and trademark applications on behalf of Highcast while working at PDC.  During this time period, PDC paid various legal bills that Highcast incurred while attempting to perfect its intellectual property rights.  No tax return was filed on behalf of Highcast in 2000, and Maryland

consequently revoked Highcast's corporate charter in 2001.  It has not yet been revived.

In August of 2004, PDC's parent corporation decided to exit the satellite television business.  Pursuant to this decision, the parent corporation divested itself of its broadcast television and satellite television businesses.  This divestiture resulted in PDC's loss of interest in Highcast.  On October 29, 2004, PDC terminated Hane.

On November 18, 2004, Hane noticed the first-ever Highcast shareholders' and directors meeting.  The meeting was scheduled to take place on November 29, 2004, and the topics of discussion included commercialization of Highcast's intellectual property, the 2005 budget and funding, election of directors, and various administrative matters.  Pagon did not respond to the notice and did not attend the meeting.

On December 1, 2004, Hane sent Pagon an email stating that the two individuals needed to discuss Highcast.  Hane reminded Pagon that Pagon was a board member of Highcast and that PDC was a shareholder.  He also informed Pagon that various actions needed to be taken immediately, which would require immediate funding from PDC.  Furthermore, Hane claimed that he could not obtain funding elsewhere as long as the SPA was in place.  Pagon did not respond to this email.

On December 13, 2004, Hane's counsel sent a letter to Pagon stating that PDC was in default of its obligations to Highcast, but it did not specify the details of the alleged default.  PDC did not respond to this letter.

On July 11, 2005, Hane sent a letter to Pagon stating that PDC was in default of its obligations under the SPA.  In the letter, Hane specified that PDC's defaults included (i) its refusal to provide working capital to Highcast pursuant to the SPA, and (ii) failure to provide basic administrative services to Highcast.  Hane also stated that Pagon had failed to meet his obligations as a director of Highcast.  The parties subsequently engaged in a series of correspondence that ultimately culminated in PDC notifying Hane that the company had filed the present declaratory judgment action.

PDC's complaint for declaratory relief contains two counts.  Count one seeks a declaration that PDC owes no further duties to Hane or Highcast under the SPA due to the failure of several conditions precedent.  Count two seeks a declaration that the applicable statute of limitations bars any claim that may otherwise arise out of the SPA.

In answering PDC's complaint, Hane has alleged two counterclaims against PDC and a cross-claim against Pagon.  In the first counterclaim, Hane alleges that PDC has breached the SPA by refusing to provide funding to Highcast.  In the second

counterclaim, Hane alleges that PDC has breached an oral amendment to the SPA by refusing to provide administrative services to Highcast.  In the cross-claim, Hane alleges that Pagon has breached his fiduciary duties to Highcast.

II.  Analysis[1]

The Court will analyze the parties' arguments in the context of Hane's counterclaims and cross-claim.  First, the Court will address Hane's claim that PDC has breached the SPA by refusing to provide funding to Highcast.  This portion of the opinion will also address PDC's reciprocal claim that PDC owes no further duties under the contract.  Second, the memorandum will analyze Hane's claim that PDC has breached an oral amendment to the SPA by failing to provide administrative services to Highcast.  And finally, the memorandum will analyze Hane's claim that Pagon has breached his fiduciary duty to Highcast.

---

[1]    On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2006).

A.    Breach of Contract -- Failure to Provide Funding Under
the SPA

Hane argues that he is entitled to summary judgment on his claim that PDC breached the SPA by failing to provide funding to Highcast because:  (i) all conditions precedent to full funding under the SPA have been met; (ii) even if certain conditions precedent to full funding have not been met, PDC is barred from relying on them by the doctrines of waiver and/or estoppel; (iii) even if certain conditions precedent have not been met or waived; PDC has breached its obligation to provide funding pursuant to the Final First Closing; and (iv) the applicable statute of limitations does not bar its claim.

PDC responds by arguing that its refusal to provide funding to Highcast did not constitute a breach of the SPA because:  (i) certain conditions precedent have not been, and cannot be, met; (ii) PDC is not barred by waiver or estoppel from relying on these conditions precedent; (iii) Hane never asked that the Final First Closing take place; and (iv) Hane's claim for breach of the SPA is barred by the applicable statute of limitations.

1.    Whether All Conditions Precedent to Full Funding
Under the SPA Have Been Met

Hane argues that he is entitled to summary judgment on this breach of contract claim because all relevant conditions precedent in the SPA have been met, and therefore, PDC's refusal

to provide funding to Highcast constitutes a breach of that contract.  PDC responds by arguing that certain conditions precedent have not been, and cannot be, met, and therefore, its refusal to provide additional funding to Highcast does not constitute a breach of the SPA.  The Court agrees with PDC's argument.

Under Delaware law,[2] a condition precedent is "an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc., No. 04L-10-101 RRC, 2006 WL 2567916, at *21 (Del. Super. Ct. Aug. 31, 2006).  Interpreting a term of a contract as a condition precedent is not favored when such an interpretation would result in a forfeiture.  See id.  When the terms of a contract are clear and unambiguous, however, a court must give those terms their plain meaning.  Id.  In the present case, the terms of the SPA are unambiguous.  The Court will therefore give the terms their plain meaning.

---

[2]    PDC argues, and Hane does not dispute, that Delaware law governs Hane's claims that PDC breached the SPA.  As specified in the SPA, "All . . . questions concerning the construction, validity and interpretation of this Agreement will be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice fo law or conflict fo law provisions or rule . . . that would cause the application of the laws of any jurisdiction other than the laws of Delaware."  (SPA at § 7.3).

Pursuant to the SPA, PDC agreed to purchase 80% or more of Highcast's equity at a series of closings.  The great majority of these equity purchases would take place at seven "Additional First Closings," where PDC agreed to purchase 70% of Highcast's stock in 10% tranches.  Under the heading, "Conditions to Purchaser's Obligations at Each Additional First Closing," the SPA recited various events that needed to take place before PDC became obligated to execute each Additional First Closing.  These events included (i) continuation of Hane's employment at PDC, so long as PDC owned less than 50% of Highcast's equity, and (ii) agreement between Highcast and PDC on the "First Budget."  SPA at §§ 1.2, 4.2;[3] SPA Schedule 4.2(b).[4]

Under the subsection entitled "First Budget," the SPA specified that Hane and PDC "shall cooperate in the preparation of a business plan and budget of [Highcast] mutually acceptable [sic] the parties hereto regarding the use of up to $750,000 to be invested by [PDC] pursuant to this Agreement as soon as reasonably practicable, but no later than February 29, 2000 and January 31, 2000, respectively."  The SPA also specified that each Additional First Closing was scheduled to take place within

---

[3]    A copy of the Securities Purchase Agreement ("SPA") is attached to the plaintiff's motion for summary judgment as Exhibit F and cited herein as "SPA ¶ __."

[4]    A copy of Schedule 1.2(b) to the SPA is attached to the plaintiff's motion for summary judgment as Exhibit H and cited herein as "SPA Schedule 4.2(b)."

thirty days of Highcast's satisfaction of milestones set forth in the "First Budget."  SPA § 4.2.

The relevant conditions precedent to PDC becoming obligated to execute any Additional First Closings were therefore (i) Hane's continued employment at PDC, at least until PDC owned 50% of Highcast's equity, and (ii) agreement between Highcast and PDC on the "First Budget."  See Commonwealth Constr., 2006 WL 2567916, at *21.

It is undisputed that Hane is no longer employed at PDC and that PDC owns less than 50% of Highcast's equity.  Hane himself has admitted that PDC's ownership stake in Highcast has never exceeded five percent.  Hane Dep. at 166.[5]  Furthermore, although Hane argues that various budgets and business plans for Highcast were agreed upon, it is clear that these agreements did not constitute the "First Budget" as contemplated by the SPA. Indeed, when pressed at oral argument about whether any such "First Budget" document existed, Hane eventually admitted that it did not:

> The Court: But the additional first closings were
> scheduled to take place within 30 days of Highcast['s]
> satisfaction of milestones set forth in a document
> called the First Budget.  Is there such a first budget
> that has milestones in it?
>
> Mr. Halpern: There is not.

---

[5]    Excerpts of John Hane's deposition are attached to the plaintiff's motion for summary judgment as Exhibit B and cited herein as "Hane Dep. at ___."

-11-

Tr. at 23.[6]  Hane's argument that all conditions precedent have been met therefore fails.

### 2.   Whether Estoppel and/or Waiver Bar PDC from Relying on Certain Conditions Precedent in the SPA

Hane argues that even if certain conditions precedent to PDC's incurring further obligations under the SPA have not been met, Hane is nevertheless entitled to summary judgment on this breach of contract claim because (i) PDC is estopped from relying on the failure of these conditions precedent, and/or (ii) PDC has waived these conditions precedent.  According to Hane, PDC treated the SPA as still in force throughout Hane's employment at the corporation.  Estoppel and waiver should therefore bar PDC from now arguing that Hane failed to fulfill certain conditions precedent during this time period.  PDC responds by arguing that it is neither estopped from relying on, nor has it waived, any conditions precedent contained in the SPA.

### a.   Estoppel

The doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment."  Wilson v. Am. Ins. Co., 209 A.2d 902, 903-04 (Del.

---

[6]   Oral arguments regarding all pending motions in this case were held on June 13, 2007.  The transcript from this hearing is cited herein as "Tr. at __."

1965).  The party claiming estoppel must show that (i) it lacked
knowledge or the means of obtaining knowledge of the truth of the
facts in question, (ii) relied on the conduct of the party
against whom estoppel is claimed, and (iii) suffered a
prejudicial change of position as a result of this reliance.
Burge v. Fidelity Bond & Mortgage Co., 648 A.2d 414, 420 (Del.
1994).  In the present case, Hane possessed the means of
obtaining knowledge of the truth of the facts in question.  Hane
simply needed to read the SPA, whose clear and unambiguous
language disclosed the conditions precedent to PDC's becoming
obligated to execute the Additional First Closings.  SPA § 4.2.
The doctrine of estoppel is therefore inappropriate in the
present context.

          b.  Waiver

          It is well-established in Delaware that contractual
requirements may be waived.  AeroGlobal Capital Mgmt., LLC v.
Cirrus Indus., Inc., 871 A.2d 428, 444 (Del. 2000).  The
standards for establishing waiver, however, are "quite exacting."
Id. (citing Pepsi-Cola Bottling Co. v. Pepsico, Inc., 297 A.2d
28, 33 (Del. 1972).  Waiver is the voluntary and intentional
relinquishment of a known right.  Id.  It implies knowledge of
all material facts, an intent to waive, and a willingness to
refrain from enforcing a contractual right.  Id.  To show waiver,
a party must demonstrate that (i) there is a requirement or

condition to be waived, (ii) the waiving party knew of the requirement or condition, and (iii) the waiving party intended to waive that requirement or condition.  Id.  Intention forms the foundation of the doctrine of waiver, and an intention to waive must be clear from the record evidence.  Id. at 445.

In the present case, Hane submits various documents that he contends show PDC's intent to waive all conditions precedent to PDC's becoming obligated to provide full funding to Highcast under the SPA.  In particular, Hane submits the February 7, 2000, amendment to the SPA that split the First Closing into an "Initial First Closing" and a "Final First Closing."  2/7/00 SPA Amendment.[7]  According to Hane, this amendment shows PDC's intent to waive the condition precedent that a "First Budget" be agreed upon because it occurred one week after the parties were required to adopt the "budget" portion of the "First Budget."[8]

Furthermore, Hane submits a June 11, 2000, email from Pagon to Ted Lodge, PDC's then-general counsel, in which Pagon described a conversation with Hane about amending the SPA:  "I asked (and [Hane] agreed) that we amend the provisions of the

---

[7]    A copy of the September 7, 2000, amendment to the SPA is attached to the plaintiff's motion for summary judgment as Exhibit G and cited herein as "2/7/00 SPA Amendment."

[8]    As specified in the SPA, the parties were required to cooperate in the preparation of a business plan and budget of Highcast as soon as reasonably practicable, but no later than February 29, 2000 and January 31, 2000, respectively.  SPA § 4.2(e).

current Highcast Agreement so that [PDC] has a HARD option
(unilateral) to acquire up to 80% of Highcast for $750,000."
6/11/00 Email from Pagon to Lodge.[9]  Hane also submits various
emails acknowledging that PDC paid Highcast's legal bills
throughout Hane's tenure at PDC.  Various Emails Regarding
Payment of Highcast Legal Fees.[10]  According to Hane, these
emails show that PDC waived any conditions precedent in the SPA
by treating the contract as still in full force throughout his
employment at the company.

These submissions do not evidence a clear intent by PDC
to waive any conditions precedent contained in the SPA.  See
AeroGlobal, 871 A.2d at 445.  First, the February 7, 2000,
amendment to the SPA specified that it only affected section 4.1
and schedule 4.2(b) of the contract.  It also specifically stated
that "all of the terms and conditions of the [SPA] shall remain
in full force and effect."  2/7/00 SPA Amendment.  The condition
precedent of agreement on the "First Budget" appeared in section
4.2 of the contract.  SPA § 4.2.  The February 7, 2000, amendment

_____

[9]     A copy of Pagon's June 11, 2000, email to Lodge
is attached to the defendant's motion for summary judgment as
Exhibit 13 and cited herein as "6/11/00 Email from Pagon to
Lodge."

[10]    Copies of various emails acknowledging that PDC paid
certain legal bills on behalf of Highcast are attached to the
defendant's motion for summary judgment as Exhibit 15 and cited
herein as "Various Emails Regarding Payment of Highcast Legal
Fees."

therefore had no bearing on the requirement that the "First Budget" be agreed upon.

Second, the discussion of potentially amending the SPA to give PDC the unilateral option to invest any further in Highcast does not evidence a clear intent to waive any conditions precedent to PDC becoming obligated to undertake such a responsibility.[11]  And finally, PDC's payment of Highcast's legal bills likewise does not demonstrate a clear intent by PDC to waive any conditions precedent.  The SPA contains no references to PDC's obligation to pay Highcast's legal bills, and the fact that no shares of Highcast were ever conveyed to PDC in exchange for these payments shows that the parties did not treat them as further investments in Highcast.  See generally SPA; Hane Dep. at 104-05.

---

[11]    Neither party argues that this potential amendment to the SPA was ever actually executed.  PDC argues that the proposed amendment did not become part of the SPA because it was not in writing, as was required by the SPA.  Pl. & Pagon's Opp. to Def.'s MSJ at 13; SPA § 7.7.  Hane, on the other hand, appears to argue that the discussion of the proposed amendment is significant not because the amendment was actually enforceable, but because it shows that PDC treated the SPA as still in force after the time when the "First Budget" was required to be agreed upon.  The Court understands Hane's argument to be such because if the Court accepted Hane's argument that the parties actually agreed to this amendment, then Hane's claim for breach of contract would fail.  The proposed amendment would have given PDC the unilateral option of whether to invest any further in Highcast -- an option that Hane admits PDC never exercised.  6/11/00 Email from Pagon to Lodge; Hane Dep. at 180.

3.   Whether PDC Breached the SPA by Failing to Conduct
     the Final First Closing

Hane's final argument for summary judgment on his contract claim stems from the parties' failure to conduct the Final First Closing.  Hane argues that, even if the conditions precedent to PDC's further funding of Highcast have not been met or otherwise waived or excused, no such conditions precedent exist to PDC's obligation to invest an additional $46,875 at the Final First Closing.  As to that $46,875, Hane contends he is entitled to summary judgment.  PDC responds by arguing that it did not breach any obligation to consummate the Final First Closing because Hane never requested that the transaction take place.  PDC also argues that Hane's claim for the Final First Closing is time-barred.

The February 7, 2000, amendment to the SPA divided the First Closing set out in the SPA into an Initial First Closing and a Final First Closing, each of which required the transfer of 53 shares of Highcast common stock to PDC in exchange for $46,875.  The Initial First Closing took place on the day the SPA was amended.  The Final First Closing was to take place "as of a date mutually agreeable to the parties."  Both parties agree that no date for the Final First Closing was ever set and the closing never took place.

Under Delaware law, where parties have not specified a time for performance under a contract, a court should "imply a

-17-

reasonable time." <u>Martin v. Star Pub. Co.</u>, 126 A.2d 238, 244
(Del. 1956); <u>see also</u> <u>Hazen v. Miller</u>, 1991 WL 244240 at *2 (Nov.
18, 1991) (holding court could impute a reasonable time for
performance in contract to purchase shares of a business).  To
determine what constitutes a reasonable time, a court must look
to the circumstances of the transaction.  <u>Bryan v. Moore</u>, 863
A.2d 258, 261 (Del. Ch. Ct. 2004)

Here, the amendment to the SPA does not specify when
the Final First Closing was to take place.  Accordingly, under
Delaware law, the closing was required to take place within a
reasonable period of time.  To determine what length of time was
reasonable, the Court must consider the provisions of the SPA and
the circumstances of its amendment.

Under the original SPA, the First Closing was to take
place the same day as the SPA was signed, on December 15, 1999.
The original SPA contemplated that the First Budget, which would
set out the milestones that triggered Additional First Closings
under the agreement, was to be completed "as soon as practicable"
but no later than a month and a half after the anticipated date
of the First Closing for the required budget (January 31, 2000)
and two and a half months after that date for the required
business plan (February 29, 2000).  Satisfaction of each
milestone in the First Budget would then trigger an Additional
First Closing, which was to take place within 30 days after each

milestone was met.  When the First Closing contemplated in the
original SPA did not take place, the parties amended the SPA on
February 7, 2000, seven weeks after the SPA was signed.  The
amendment required half of the amount due under the First Closing
to be payable upon the amendment being signed as the Initial
First Closing, with the second half to be paid as the Final First
Closing at a mutually agreed upon time.

From these facts, the time periods the parties'
contemplated between their agreeing to take an action relating to
the SPA or its amendment and their actually completing the action
range from the same day, as in the agreement to pay the Initial
First Closing immediately upon signing the amendment creating
that obligation, to two and a half months, as in the deadline set
out in the SPA for the First Budget.  Even interpreting the
contract generously in favor of Hane, the longest "reasonable
time" for consummating the Final First Closing that would
consistent with the other time periods set out in the SPA and its
amendment would be perhaps three months.  This would make the
deadline for the Final First Closing approximately early May
2000, three months after the SPA's amendment on February 7, 2000.

Having determined when the Final First Closing was to
take place, the Court must consider how to interpret the
obligation to pay it.  There are two possibilities.  Based on the
amendment's language that the Final First Closing was to be made

at a _mutually_ agreeable time, the amendment could be interpreted
as placing obligations on both parties:  on Hane to request the
payment and on PDC to then pay the required amount in return for
Highcast shares.

     If the amendment is interpreted this way, then the
evidence presented shows that Hane never requested that PDC pay
the First Final Closing.  Although Hane has submitted various
emails and letters in which he notified PDC that the company was
in default of its obligations to provide funding under the SPA,
nowhere in any of these communications does Hane mention the
Final First Closing, let alone request a date for its
occurrence.[12]  At deposition, Hane conceded that he never asked
PDC to conduct the Final First Closing.  Hane Dep. at 102-05.
Under this interpretation, having failed to request PDC's

---

     [12]    For example, on July 11, 2005, Hane sent Pagon a letter
stating that PDC had defaulted by refusing to provide working
capital to Highcast pursuant to the SPA, as amended.  July 11,
2004, Letter from Hane to Pagon, cited herein as "7/11/05 Letter
from Hane to Pagon."  Despite being asked to be more specific
about how Hane thought PDC had defaulted under the SPA, Hane
refused to provide any further details, saying that "it would be
foolish for me to provide a blueprint of Highcast's litigation
preparations."  July 28, 2005, Letter from Scott Blank ("Blank")
to Hane, cited herein as "7/28/05 Letter from Blank to Hane";
August 8, 2005, Letter from Hane to Blank, cited herein as
"8/8/05 Letter from Hane to Blank."  When pressed further, Hane
simply stated that PDC's default was composed of its failure to
invest up to $2 million in Highcast.  September 20, 2005, Letter
from Hane to Blank, cited herein as "9/20/05 Letter from Hane to
Blank."  All of these letters are attached to the plaintiff's
motion for summary judgment at Exhibit V.

performance within the contractual period, Hane's right to do so has elapsed and PDC's non-performance is excused.

The alternative interpretation of the obligation to make the Final First Closing is to view it as only placing an obligation on PDC to consummate the Final First Closing within a reasonable time, without any requirement that Hane make a request for PDC to do so.  Under this interpretation, PDC breached the SPA, as amended, when it failed to tender $46,875 for the Final First Closing by early May 2000.

This interpretation, however, does not save Hane's claim.  The statute of limitations for contract actions in Delaware is three years.  10 Del. C. § 8106.  This action was not filed until November 25, 2005, and Hane's answer setting forth his counterclaim for breach of the SPA was not filed until March 29, 2006, over five years after PDC would have breached its obligation to complete the Final First Closing.

Hane's claim for breach of contract for failure to complete the Final First Closing therefore fails under either interpretation of the contractual language and judgment on this claim must be granted for PDC.

B.   Breach of Contract -- Failure to Provide Administrative Services

Hane argues that he is entitled to summary judgment on his claim that PDC breached an oral amendment to the SPA by

refusing to provide Highcast with certain administrative services.  PDC argues that it is entitled to summary judgment on this claim primarily because the SPA required all amendments to the SPA to be in writing (SPA at § 7.7).  It also argues that PDC cannot owe administrative services to a corporation whose charter was revoked.

Under Delaware law, a prohibition in a contract against amendment except by written change may be waived or modified in the same way that any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the parties' course of conduct.  <u>Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.</u>, 297 A.2d 28, 33 (Del. 1972).  Delaware law, however, places a "high evidentiary burden" on a party alleging oral modification of a written contracts.  <u>913 N. Mkt. St. P'ship, L.P. v. Davis</u>, No. 274, 1998 Del. LEXIS 493, at *3 (Del. Dec 23, 1998).  An oral modification of a written contract "must be of such specificity and directness as to leave no doubt of the intentions of the parties to change what they previously solemnized by formal document."  <u>Reeder v. Sanford Sch., Inc.</u>, 397 A.2d 139, 141 (Del. Super. Ct. 1979).

The Court questioned counsel for Hane at oral argument in an attempt to understand the claim for administrative services.  Counsel said that the oral amendment to the SPA to pay

for administrative services for Highcast was made in 2000.  PDC
paid for legal fees for Highcast through October of 2004.
Thereafter, PDC did not pay any further administrative services.
When the Court asked counsel what administrative services were
required to be paid thereafter, counsel responded more legal
fees.  Tr. at 43-46.

        The Court will grant summary judgment on this claim to
PDC.  The summary judgment record relating to an alleged
amendment to the SPA regarding administrative services, to the
extent it exists, does not contain the "specificity and
directness" required by Delaware law to make out an oral
modification of a written contract.  The Court does not decide
whether someone can owe duties to a corporation after its charter
is revoked.


        C.   Breach of Fiduciary Duty

        Hanes' breach of fiduciary duty claim against Pagon
comes down to the fact that Pagon did not attend one Highcast
Board of Directors meeting (or two meetings if the Court includes
the calling of the meeting that occurred after the filing of this
case) called by Hane after he was terminated by PDC and after
Highcast's corporate charter was revoked.  The Court grants
summary judgment to Pagon on this claim.

        Under Maryland law, a plaintiff who seeks to recover
for breach of fiduciary duty must demonstrate (i) the existence

of a fiduciary relationship, (ii) the breach of a duty owed by
the fiduciary to the beneficiary, and (iii) harm resulting from
the breach.  <u>Alleco, Inc. v. Harry & Jeanette Weinberg Found.,</u>
<u>Inc.</u>, 665 A.2d 1038, 1046 (Md. 1995).

These facts do not amount to a breach of fiduciary
duty.  Hane could have replaced Pagon on the Board so there was
no harm from Pagon's failure to attend the meeting.  In addition,
it is unlikely that a director has a fiduciary duty to a
corporation whose charter was revoked years before the meeting
was called.  Even if Pagon did have a fiduciary duty to a
corporation whose charter was revoked, a fiduciary duty claim is
a derivative claim and must be brought on behalf of the
corporation.  Hane has not brought his counterclaim on behalf of
Highcast.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PEGASUS DEVELOPMENT            :    CIVIL ACTION
CORPORATION, Plaintiff and     :
Counter-defendant              :
                               :
        v.                     :
                               :
JOHN HANE, Defendant and       :
Counter-plaintiff              :
                               :
        v.                     :
                               :
MARSHALL W. PAGON,             :
Counter-defendant              :    NO. 05-6148


<u>ORDER</u>


AND NOW, this 27th day of September, 2007, upon consideration of the Motion for Summary Judgment of plaintiff and Marshall W. Pagon (Docket No. 62), the Motion for Summary Judgment of defendant (Docket NO. 63), the oppositions to the motions, and after oral argument held on June 13, 2007, IT IS HEREBY ORDERED that Pegasus Development Corporation's and Marshall W. Pagon's motion is GRANTED and John Hane's motion is DENIED.  Judgment is hereby entered for Pegasus Development Corporation and Marshall W. Pagon and against John Hane.  This case is closed.


BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.